291 So.2d 122 (1974)
James DINKENS, Appellant,
v.
STATE of Florida, Appellee.
No. 72-560.
District Court of Appeal of Florida, Second District.
February 27, 1974.
*123 Richard W. Ervin, III, Public Defender, and Michael J. Minerva, Asst. Public Defender, Tallahassee, for appellant.
Robert L. Shevin, Atty. Gen., and Richard W. Prospect, Asst. Atty. Gen., Tallahassee and P.A. Pacyna, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
James Dinkens appeals an adverse judgment and sentence to life imprisonment for murder in the first degree.
Dinkens' first point asserts that it was error to admit into evidence a certain pistol shown by a ballistics test to have fired a bullet found at the scene of the crime. The seizure of this pistol was made by a detective of the Jacksonville Sheriff's office. He received a tip from a "reliable" confidential informer that he would find the pistol at a particular place under Dinkens' apartment. The officer, accompanied by another investigator, went to Dinkens' apartment and knocked on the door. Finding no one home, the officers went to the appointed location at the rear of the house where the detective reached his hand into a small vent underneath the house and found the pistol. The pistol could not be seen by the detective before he pulled it out. There was no attempt to obtain a search warrant, although the incident occurred on a Monday afternoon.
The State contends that the seizure was valid as being a seizure without a search, citing those cases which have held that a search warrant is unnecessary when the seized property is perceived by the officer through the use of one or more of his senses. See e.g., State v. Jones, Fla.App. 3rd, 1969, 222 So.2d 216 and Boim v. State, Fla.App.3rd, 1967, 194 So.2d 313. The State admits that the pistol was not in plain view but argues that "... if awareness of the presence of contraband can be gained by senses other than sight (plain view), and as suggested by Jones  smell, then why cannot this awareness be gained through personal knowledge; personal knowledge resulting from information supplied by a previously reliable source... ."
*124 While the State's argument is based upon the use of one's senses, it doesn't make good "sense." The only use the detective made of his senses to ascertain the location of the pistol was to listen to the informer tell him about it. If one's personal knowledge resulting from information supplied by a third party is equivalent to an officer's direct use of his own senses, there would seldom be a need for a search warrant in any type of seizure.
The only other aspect to be considered with respect to this seizure is whether the area beneath Dinkens' apartment was within the area of protection from search and seizure under the Fourth Amendment. While the U.S. and Florida Constitutions each specifically refer to protection of persons, houses, papers and effects, our courts have held that this protection extends to the "curtilage" of one's home. Phillips v. State, Fla.App.1st, 1965, 177 So.2d 243; Houston v. State, Fla.App.1st, 1959, 113 So.2d 582. It has been held that property adjacent to the home but not connected with its use is not part of the curtilage. Phillips v. State, supra. The fact that the searching authority may be trespassing does not necessarily invalidate a search and seizure. Cobb v. State, Fla.App.2nd, 1968, 213 So.2d 492. However, we have found no case which suggests that intrusion into the home itself, albeit underneath, would not be within the constitutional protection.
A very similar seizure occurred in Marullo v. United States, CA5th 1964, 328 F.2d 361, where an officer seized certain property located on a pillar beneath a motel cabin. The court upheld the warrantless seizure on the basis that the occupant's transient interest in the living quarters was not sufficient to provide him with constitutional protection for the space beneath the cabin shared in common with other occupants. However, the court made it clear that a contrary holding would have ensued had the living quarters constituted the defendant's home or apartment. Thus, the court said:
"A private home is quite different from a place of business or from a motel cabin. A home owner or tenant has the exclusive enjoyment of his home, his garage, his barn or other buildings, and also the area under his home. But a transient occupant of a motel must share corridors, sidewalks, yards, and trees with the other occupants. Granted that a tenant has standing to protect the room he occupies, there is nevertheless an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home."
According to the record, Dinkens' living quarters were characterized as "an apartment." The apartment consisted of an upstairs and a downstairs, all of which were occupied by Dinkens. Upon these facts, we are compelled to conclude that the area beneath the apartment was within the constitutional protection against unreasonable search and seizure. In the absence of a search warrant, the officers had no right to seize the pistol, and the evidence should have been suppressed.
Since the case will need to be retried, we think it advisable to comment on another aspect of the evidence. During the trial an accomplice, James Williams, Jr., testified that he participated in the robbery during which the crime charged was committed. He stated that he, Dinkens, and two others, Young and Prosser, planned the instant robbery of the Berrier Ice Cream Parlor at Young's house; that about 9:00 o'clock at night he drove Young's car to Berrier's place and kept the engine running while the other three went inside. Young had a rifle and the other two had pistols. After the robbery they went to Young's home and divided the money in four parts, each getting a share. Young said he had to shoot a man; Dinkens said that he had fired his pistol; but they came to the conclusion that Young had shot the man.
*125 Over objection, James Williams, Jr. then testified as to two collateral crimes. He said that on the same night the same four persons went to a Drive-In Theatre. Williams stayed in the car and kept the engine running while the others went into the theatre carrying the same weapons. When they returned to the car they went to Young's house and again divided the money. He further stated that about twenty days later the same four went to the Daylight Grocery, with Williams driving the car. Young carried a rifle and the other two had pistols. The other three went inside and when they came back they went to Prosser's home and divided the money again. Young said that he had to shoot two men while they were in the store. In the Daylight robbery they used a stolen car; the robbery took place about 2:00 o'clock in the afternoon; and the three accomplices were dressed as females.
Dinkens contends that the testimony relating to other crimes went beyond the limits prescribed under the Williams Rule (Williams v. State, Fla. 1959, 110 So.2d 654). This is readily apparent with respect to the Daylight Grocery robbery. The facts in that robbery were so dissimilar to those in the instant Berrier robbery that it could not be said there was a common modus operandi. The Daylight Grocery robbery occurred in the daytime; the robbers used a stolen car and disguised themselves as females. The Berrier robbery was at night; the robbers were not disguised; and they used the automobile of one of the participants. The testimony as to the Daylight Grocery robbery was irrelevant and should not have been admitted. See Duncan v. State, Fla.App.2nd, 1974, 291 So.2d 241.
The testimony about the Drive-In Theatre robbery presents a closer question. There were enough points of similarity between the Drive-In Theatre robbery and the Berrier robbery so that it could be said that the same general pattern or modus operandi existed in both. The difficulty we see in this testimony is that it was given by the same person who testified that Dinkens was involved in the Berrier robbery.
Generally, the relevance of showing a modus operandi is that if a particular person is identified as having committed a crime similar in peculiar methods of operation to the one for which he is presently charged, his identification involving the other crime bolsters the identification with respect to the crime for which he is on trial. This presupposes an independent identification in each occurrence. In this case, the only evidence of the Drive-In Theatre robbery was the testimony of James Williams, Jr., who also testified concerning Dinkens' involvement in the Berrier robbery. Williams' testimony implicating Dinkens in the crime for which he was charged was not bolstered or aided in any material way by his testimony that Dinkens participated in the Drive-In Theatre robbery.
Either the jury believed Williams with respect to the instant crime or they did not. It may be that the jury would more readily believe Dinkens committed the instant crime if another witness had identified him as also being involved in the similar Drive-In Theatre robbery. But, there was no such independent evidence here. As presented on this record, the only purpose this testimony appears to have served was to illustrate Dinkens' bad character and his propensity to commit robbery.[1] As such it was inadmissible. Randall v. State, Fla.App.2nd, 1970, 239 So.2d 81.
Upon retrial, we do not foreclose the introduction of evidence concerning Dinkens' connection with the drive-in robbery providing *126 it rests, at least in part, on testimony other than that of James Williams, Jr. or could be said to be relevant for reasons other than identification based upon similar modus operandi.
The judgment is reversed, and the case is remanded for a new trial.
MANN, C.J., and McNULTY and GRIMES, JJ., concur.
NOTES
[1] We can visualize a situation where the same witness, if he were not acquainted with the accused, could properly identify a person as being involved in two crimes, because his identification in connection with the second crime might tend to bolster the degree of certainty concerning his identification at the first.