511 So.2d 282 (1987)
Michael A. RILEY, Petitioner,
v.
STATE of Florida, Respondent.
No. 67906.
Supreme Court of Florida.
July 9, 1987.
Rehearing Denied September 11, 1987.
*283 Marc H. Salton, New Port Richey, for petitioner.
Robert A. Butterworth, Atty. Gen. and Candance M. Sunderland, Asst. Atty. Gen., Tampa, for respondent.
BARKETT, Justice.
We have for review State v. Riley, 476 So.2d 1354 (Fla. 2d DCA 1985), in which the district court upheld the validity of a seizure of marijuana under a search warrant obtained as the result of aerial surveillance and certified the following as a question of great public importance:
WHETHER POLICE OFFICERS, RESPONDING TO AN ANONYMOUS TIP, MAY MAKE A LEGALLY PERMISSIBLE PREINTRUSION OPEN VIEW FROM THE VANTAGE POINT OF A HELICOPTER TRAVELLING AT 400 FEET ABOVE A BACK YARD AREA IN WHICH AN INDIVIDUAL HAS MANIFESTED A REASONABLE EXPECTATION OF PRIVACY FROM GROUND AND AIR SURVEILLANCE, AND ON THE BASIS OF SUCH AERIAL OBSERVATION OBTAIN A SEARCH WARRANT JUSTIFYING THE SEIZURE OF SIGHTED CONTRABAND?
Id. at 1356-57.
Because the certified question as stated contains language inconsistent with established search-and-seizure analysis, we restate the question as follows:
WHETHER SURVEILLANCE OF THE INTERIOR OF A PARTIALLY COVERED GREENHOUSE IN A RESIDENTIAL BACKYARD FROM THE VANTAGE POINT OF A HELICOPTER LOCATED 400 FEET ABOVE THE GREENHOUSE CONSTITUTES A "SEARCH" FOR WHICH A WARRANT IS REQUIRED UNDER THE FOURTH AMENDMENT AND ARTICLE I, SECTION 12 OF THE FLORIDA CONSTITUTION?
The issue here is one of first impression in this state and one which obviously involves serious questions of public policy. We have jurisdiction pursuant to article V, section 3(b)(4) of the Florida Constitution, answer the restated question in the affirmative, and quash the decision of the district court below.
Petitioner Michael A. Riley rented approximately five acres of rural property on which was located a mobile home which petitioner used as a residence. The greenhouse in question was located ten to twenty feet behind the mobile home. Both buildings were enclosed by a net wire fence. A "DO NOT ENTER" sign was posted in front of the mobile home. The greenhouse was enclosed on two sides; the remaining sides were obscured by trees and shrubbery within the fenced area and the mobile home. Two panels were missing from the roof of the greenhouse, exposing approximately one-tenth of the roof area.
Deputy Kurt Gell of the Pasco County Sheriff's Office, acting upon an anonymous tip that marijuana was being grown on petitioner's property, went to investigate. Unable to discern the contents of the greenhouse from the road, Deputy Gell obtained a helicopter and flew over petitioner's property at about 400 feet.[1] Through the openings in the roof and through one or more of the open sides of the greenhouse, he saw what he believed to be marijuana. Based upon his observations from the helicopter, Deputy Gell then obtained a warrant to search the greenhouse.[2]
*284 The search warrant was executed and forty-four marijuana plants were found growing in the greenhouse. Petitioner was charged with unlawful possession and manufacture of marijuana under section 893.13, Florida Statutes (1983). The trial court granted petitioner's motion to suppress the evidence on the ground that petitioner manifested a reasonable expectation of privacy from aerial surveillance. On appeal, the Second District reversed on the authority of its own decision in Randall v. State, 458 So.2d 822 (Fla. 2d DCA 1984),[3] and certified the issue to this Court.
Petitioner, relying on Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), contends that the aerial surveillance of his greenhouse was a search in violation of his rights under the fourth amendment to the United States Constitution and article I, section 12 of the Florida Constitution. The state counters that the surveillance was a legally permissible "preintrusion view" in accordance with this Court's decision in State v. Rickard, 420 So.2d 303 (Fla. 1982), and the Second District's decision in Randall v. State. We agree with petitioner that under the facts of this case the helicopter surveillance by the state constituted a search and an impermissible violation of privacy rights.
We begin our analysis with two recent United States Supreme Court decisions involving aerial surveillance, California v. Ciraolo, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), and Dow Chemical Co. v. United States, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986).[4]
In Ciraolo, police flew over the defendant's property in a fixed-wing plane at a height of 1,000 feet to confirm an anonymous tip that the defendant was growing marijuana in his backyard. The property was surrounded by a ten foot high fence, preventing ground level observation. In Dow Chemical, a government regulatory agency took aerial photographs of Dow's industrial complex from altitudes of 12,000, 3,000, and 1,200 feet. Extensive security prevented any public viewing of the facility.
The Court reaffirmed the standard established in Katz and then applied the Katz test to the aerial surveillance which had occurred in each case. Under the Katz standard, the legality of a warrantless police intrusion into allegedly private activities depends upon whether a person has a "reasonable" expectation of privacy in the invaded area. Id., 389 U.S. at 360, 88 S.Ct. at 516 (Harlan, J., concurring). In Katz, the Supreme Court abandoned the traditional analysis which defined a search by reference to whether the police had committed a physical trespass, see Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and shifted the focus to whether the government had violated the privacy upon which the individual had justifiably relied. Katz, 389 U.S. at 353, 88 S.Ct. at 512. Recognizing that the "constitutionally protected areas" approach provided no real protection against surveillance techniques made possible through advancing technology, the Court made clear that "the Fourth Amendment protects people, not places."[5]Id. at 351-52, 88 S.Ct. at 511-12. Thus, "[w]hat [a person] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." Id.
Katz and its progeny established a twopronged test for determining whether the government has intruded upon an individual's reasonable expectation of privacy. First, an individual by his conduct must exhibit an actual subjective expectation of privacy. Second, society must be willing to *285 recognize that expectation as reasonable. Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (quoting Katz, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring)); Norman v. State, 379 So.2d 643, 647 (Fla. 1980).
The Ciraolo court, having determined that the yard in question was within the curtilage of the defendant's home, found that "[c]learly  and understandably  " the defendant had met the test of manifesting his own subjective intent and desire to maintain privacy. 106 S.Ct. at 1811. The Court noted that the protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home both physically and psychologically "where privacy expectations are most heightened." Id. at 1812.
The inquiry in Ciraolo thereafter centered on the second prong of Katz, specifically, "whether naked-eye observation of the curtilage by police from an aircraft lawfully operating at an altitude of 1,000 feet violates an expectation of privacy that is reasonable." Id. at 1812. The Court decided that the expectation was not reasonable where:
The observations ... took place within public navigable airspace ... in a physically nonintrusive manner; from this point they [the police] were able to observe plants readily discernable to the naked eye as marijuana... . Any member of the public flying in this airspace who glanced down could have seen everything that these officers observed. On this record, we readily conclude that respondent's expectation that his garden was protected from such observation is unreasonable and is not an expectation that society is prepared to honor.
106 S.Ct. at 1813 (emphasis supplied, citation omitted).
In Dow Chemical, decided the same date as Ciraolo, the Court upheld the warrantless taking of aerial photographs, again limiting its holding to observations made from public navigable airspace:
We conclude that the open areas of an industrial plant complex ... are not analogous to the "curtilage" of a dwelling for purposes of aerial surveillance; ... such an industrial complex is more comparable to an open field and as such it is open to the view and observation of persons in aircraft lawfully in the public airspace immediately above or sufficiently near the area for the reach of cameras.
Id. at 1827 (footnote omitted). The Court also rested its conclusion on the fact that the area at issue was not an area immediately adjacent to a private home, where privacy expectations are most heightened, nor an area where Dow had made any effort to protect against aerial surveillance. Id. at 1826 n. 4.
In light of Ciraolo and Dow Chemical, we believe the state's reliance on Rickard is misplaced. Rickard did not deal with aerial surveillance such as we have here nor with any other modern surveillance technologies against which a citizen can do little to protect. In Rickard, police were lawfully in a neighbor's orange grove when they observed marijuana growing in Rickard's backyard. The plants were open to naked-eye view by any casual observer. Clearly, Rickard had made no attempt to prevent observations from the orange grove and, therefore, had not exhibited a reasonable expectation of privacy in his backyard from naked-eye observations from neighboring property. Accordingly, we held that the police observations in that case were not a search but were a legally permissible "preintrusion view" which occurs when a police officer who is located where any citizen has a right to be can look into the protected area and, in a reasonable manner, observes contraband. Rickard, 420 So.2d at 305; Ensor v. State, 403 So.2d 349, 352 (Fla. 1981).[6] Such observations are *286 generally permissible because an individual has no expectation of privacy in objects or activities knowingly exposed to the public. See Katz, 389 U.S. at 351, 88 S.Ct. at 511.
Under Katz, however, the determination of whether a police officer is in a place where he or she has a right to be is not always conclusive of whether the particular conduct constitutes a search. The essential teaching of Katz is that private activities do not lose their fourth amendment protection merely because technology exists which enables the police to view the activities from an otherwise nonintrusive vantage point. See, e.g. Wheeler v. State, 659 S.W.2d 381 (Tex. Crim. App. 1982) (protracted surveillance of contents of greenhouse with telescopes and lenses of increasing magnitude constitutes a search). Wherever an individual harbors a "reasonable expectation of privacy," he or she is entitled to be free from unreasonable government intrusion.[7]
We turn now to the case at hand. As in Ciraolo, there is no question in this case that the first prong of the Katz test has been met. Petitioner clearly exhibited a subjective expectation of privacy in the greenhouse and its contents and thus we concur with the trial court and the district court in this regard. The opacity of the greenhouse, the fence surrounding it, and the "KEEP OUT" sign all show petitioner's subjective expectation that the interior of the greenhouse would remain shielded from earthbound and aerial observation. The fact that a few panels in the roof were missing does not alter our conclusion. Similar efforts have been held to establish a subjective expectation of privacy, and thus to satisfy the first prong of Katz. See e.g., People v. Sabo, 185 Cal. App.3d 845, 230 Cal. Rptr. 170 (1986) (reasonable expectation of privacy in greenhouse partially screened by evergreens and from which some roof and side panels were missing), cert. denied, ___ U.S. ___, 107 S.Ct. 2200, 95 L.Ed.2d 855 (1987); Huffer v. State, 344 So.2d 1332 (Fla. 2d DCA 1977) (reasonable expectation of privacy in hothouse located on residential premises even though plastic covering may have allowed someone to look in from the outside); State v. Knight, 63 Haw. 90, 621 P.2d 370 (1980) (defendant's covering of greenhouse with materials so as to shield contents demonstrated subjective expectation of privacy); Wheeler v. State, 659 S.W.2d 381 (Tex. Crim. App. 1982) (subjective expectation of privacy in greenhouse despite four foot square louvered opening for purpose of ventilation).
Moreover, as in Ciraolo, we find that the area in question constituted the curtilage. State and federal courts have long recognized that the curtilage concept extends to residential backyards and outbuildings located within close vicinity of the residence. Taylor v. United States, 286 U.S. 1, 6, 52 S.Ct. 466, 467, 76 L.Ed. 951 (1932); United States v. Williams, 581 F.2d 451, 454 (5th Cir.1978), cert. denied, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979); Walker v. United States, 225 F.2d 447, 449 (5th Cir.1955); State v. Rickard, 420 So.2d 303, 306 (Fla. 1982); Norman v. State, 379 So.2d 643 (Fla. 1980); Huffer v. State, 344 So.2d 1332 (Fla. 2d DCA 1977); Dinkens v. State, 291 So.2d 122 (Fla. 2d DCA 1974); State v. Fierge, 673 S.W.2d 855, 856 (Mo. App. 1984); Brown v. Oklahoma City, 721 P.2d 1346, 1349 (Okla. App. 1986).
Traditionally, the fourth amendment provides a high degree of protection to the curtilage of a residence, those areas "immediately adjacent to the home" to which extend "the intimate activity associated with the `sanctity of a [person's] home and the privacies of life' [citation omitted] ..." Oliver v. United States, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984). Indeed, the curtilage "has been considered part of [the] home itself for Fourth Amendment *287 purposes ..." Id. at 180, 104 S.Ct. at 1742. The reason for this was expressed well by the Sixth Circuit in Dow Chemical Co. v. United States, 749 F.2d 307, 314 (6th Cir.1984):
The doctrine of curtilage is grounded in the peculiarly strong concepts of intimacy, personal autonomy and privacy associated with the home. The home is fundamentally a sanctuary, where personal concepts of self and family are forged, where relationships are nurtured and where people normally feel free to express themselves in intimate ways. The potent individual privacy interests that inhere in living within a home expand into the areas that enclose the home as well. The backyard and area immediately surrounding the home are really extensions of the dwelling itself. This is ... true because people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house. Personal interactions, daily routines and intimate relationships revolve around the entire home place.
We are left with the question of whether the observation from the air in this case violates an expectation of privacy that is reasonable.
After Ciraolo, there is little question that naked-eye observations of marijuana growing in an enclosed backyard from fixed-wing aircraft within navigable airspace do not violate the federal constitution. However, we do not read Ciraolo as sanctioning an unlimited right to any type of examination of residential property from the air. Indeed, we note the care taken to qualify and limit the permissible observation to the "naked eye" from "navigable air space" at an "altitude of 1000 feet" in a "physically nonintrusive manner."[8]
These are not the facts presently before us. We simply cannot dismiss as irrelevant the difference between a fixed-wing aircraft flying at 1,000 feet and a helicopter circling and hovering at 400 feet so that its occupants can look through an opening in a roof.
As we already have noted, Katz warned of the dangers created by technological advances by which the police can conduct surveillance. Whether or not aerial surveillance is an example of such a technological advance,[9] we believe it is more susceptible to abuse and invasion of privacy than ground surveillance. As the California Supreme Court recognized in People v. Cook, 41 Cal.3d 373, 382, 221 Cal. Rptr. 499, 505, 710 P.2d 299, 305 (1985), the concept of protected areas has little meaning when it comes to aerial surveillance:
Purposeful surveillance from the air simply lays open everything and everyone below  whether marijuana plants, nude sunbathers, or family members relaxing in their lawn chairs  to minute inspection. The usual steps one might take to protect his privacy are useless.
Surveillance by helicopter is particularly likely to unreasonably intrude upon private activities. The first court to find aerial surveillance unconstitutional did so because the police hovered in their helicopter twenty to twenty-five feet above the ground and 125 feet away from appellant's residence in an effort to identify marijuana in a corral. People v. Sneed, 32 Cal. App.3d 535, 108 Cal. Rptr. 146 (1973). Other courts have recognized that because of a helicopter's virtually unlimited maneuverability and observational capabilities, helicopter surveillance poses a serious risk to privacy. See National Organization For Reform of Marijuana Laws (NORML) v. Mullen, 608 F. Supp. 945 (N.D.Cal. 1985) (highly disruptive character of low helicopter flights distinguishes them from common airplane *288 overflights to which society is accustomed), remanded, 796 F.2d 276 (9th Cir.1986). In People v. Sabo, 185 Cal. App.3d 845, 230 Cal. Rptr. 170 (1986), the court invalidated a warrantless aerial search under circumstances nearly identical to those here. Noting that helicopters may lawfully be operated in nonnavigable airspace,[10] the court concluded that such lawful operation did not fall within the aerial surveillance approved in Ciraolo and Dow Chemical. In reaching this conclusion, the court judicially noticed the unique capabilities of the helicopter as compared to fixed-wing aircraft:
To say any sighting from a helicopter in nonnavigable airspace validates a search warrant sanctions a broad range of aerial acrobatics performed in lawful manner but admittedly intrusive, such as interminable hovering, a persistent overfly, a treetop observation, all accompanied by the thrashing of the rotor, the clouds of dust, and earsplitting din. Views from navigable airspace are far removed from the situs observed ... [whereas] [t]he lawfully operated helicopter need stand back only such distance as not to hazard persons or property.
Id. 230 Cal. Rptr. at 175-76.
We do not believe that the details observed here from the vantage point of a circling and hovering helicopter could just as easily have been discerned by any person casually flying over the area in a fixed-wing aircraft. Cf. Ciraolo, 106 S.Ct. at 1813. The possibility of observation of the interior of a greenhouse by passengers on commercial and private aircraft in the public airways is extraordinarily remote. Even more remote is the possibility that an observer would connect what he or she observed to a specific person. Although petitioner may not have had a legitimate expectation that his greenhouse would not be viewed from a fixed-wing aircraft flying in navigable public airspace, we do not find unreasonable his expectation that its contents would not be examined from a helicopter hovering below 500 feet.
We are not unmindful of the legitimate law enforcement interests at stake here; we simply do not find the governmental intrusion in this case necessary to advance those objectives. We believe law enforcement can achieve its objectives without so infringing upon the privacy rights of Florida citizens.
The fourth amendment reflects a choice that our society should be one in which citizens "dwell in reasonable security and freedom from surveillance." Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Our own right to privacy amendment, article I, section 23, Florida Constitution, was meant to protect against governmental encroachments on privacy made possible by increasingly sophisticated investigative techniques. See Constitution Revision Commission proceedings (July 6, 1977) (address by Chief Justice Ben Overton); see also Cope, To Be Let Alone: Florida's Proposed Right of Privacy, 6 F.S.U.L.Rev. 671, 721-22 & 759 (1978). As United States Supreme Court Justice Brennan observed in United States v. Dunn, ___ U.S. ___, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (Brennan, J., dissenting), the fourth amendment prohibits police activity which, if left unrestricted, would jeopardize individuals' sense of security or would too heavily burden those who wish to guard against their privacy. We believe the intrusion in this case is such a burden.
There is little that an individual can do to bar either the public or police from aerial viewing of an open area, even if the area is within the curtilage and otherwise entitled to fourth amendment protection. We cannot believe that society is prepared to say that individuals relinquish all expectations of privacy in their residential yards merely because they have not taken the extraordinary steps required to protect *289 against all types of aerial surveillance.[11] The right to be let alone includes not only the right to be free from surveillance within the confines of four walls and a roof but also the right to enjoy outdoor activities in private in one's own backyard. See State v. Ward, 62 Hawaii 509, 517, 617 P.2d 568, 573 (1980) (constitution does not require person to shut himself off from "fresh air, sunlight and scenery"); Wheeler, 659 S.W.2d at 390 (constitution does not require that one erect a stone bastion, or retreat to the cellar to exhibit a reasonable expectation of privacy).
Recognizing that the question in this case is a close one, we think the Supreme Court's admonition of over a century ago bears repeating:
It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.
Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886).
Accordingly, we find that petitioner had a reasonable expectation that his activities inside the greenhouse would remain private and out of the view of aerial observers. In circling and descending below "public navigable airspace," Detective Gell impermissibly invaded Riley's privacy and his observations thus constituted a search under the fourth amendment to the federal constitution and article 1, section 12 of the Florida Constitution. We, therefore, quash the decision of the Second District and remand for reinstatement of the trial court's suppression order.
It is so ordered.
McDONALD, C.J., OVERTON, EHRLICH and SHAW, JJ., and ADKINS, J. (Ret.), concur.
NOTES
[1] The evidence was unclear as to whether the helicopter descended below 400 feet. The helicopter did circle over the greenhouse twice. Riley, 476 So.2d at 1355.
[2] Although Deputy Gell also took photographs of the greenhouse from the air, the trial judge apparently accepted his statement that he identified the marijuana from the air and not from the photographs. Riley, 476 So.2d at 1355.
[3] In that case, the district court certified a similar question to the Court, but the parties did not pursue the issue. Randall, 458 So.2d at 826.
[4] These cases were decided after the decision of the Second District below.
[5] This does not mean that the location of the observed activities or objects has no bearing on search-and-seizure analysis. The question whether a legitimate expectation of privacy has been invaded generally requires reference to a place. Katz, 389 U.S. at 361, 88 S.Ct. at 516.
[6] Because the police are not already legally within the protected area when the observation is made, they must obtain a warrant before entering the protected area to seize the contraband. A "preintrusion view" is thus different from the "plain view" exception to the fourth amendment's warrant requirement established in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). See Ensor. Under the "plain view doctrine," when police legally within a constitutionally protected area observe, without the benefit of a search, evidence which they have probable cause to believe is contraband, they may seize it without a warrant.
[7] Accordingly, we have restated the certified question to avoid the implication that an alleged search might be valid despite the finding that both prongs of the Katz test have been satisfied, to wit, that the appropriately manifested expectation of privacy in the area searched was reasonable.
[8] In a footnote to its conclusion, the Court noted that the state conceded that "`[a]erial observation of curtilage may become invasive, either due to physical intrusiveness or through modern technology which discloses to the senses those intimate associations, objects or activities otherwise imperceptible to police or fellow citizens.'" Ciraolo, 106 S.Ct. at 1813-14 n. 3.
[9] At least one court has so held. United States v. Broadhurst, 805 F.2d 849, 853 n. 3 (9th Cir.1986). But see State v. Myrick, 102 Wash.2d 506, 688 P.2d 151 (1984) (rejecting the contention that aircrafts generally are overly intrusive technological devices when used for surveillance purposes).
[10] The Sabo court relied on federal law defining navigable airspace as that airspace above the minimum altitudes of flight prescribed by the regulations of the Civil Aeronautics Board. 49 U.S.C. §§ 1304, 1301(29). The minimum altitude for a fixed wing aircraft is 1,000 feet over a congested area and 500 feet over a noncongested area. 14 C.F.R. § 91.79(b) & (c) (1986). Helicopters may be lawfully operated at less than minimum altitudes, and therefore below navigable airspace, so long as the operation is conducted "without hazard to persons or property on the surface." 14 C.F.R. § 91.79(d) (1986). 230 Cal. Rptr. at 174-75.
[11] To require persons to erect such barriers is akin to requiring people to install lead insulation to protect against x-ray surveillance of their homes.