**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Michael C. VOGEL, Defendant and Appellant.**

**No. 15961.**

Supreme Court of South Dakota.

Argued May 23, 1988.

Decided Aug. 24, 1988.

Mark A. Moreno, Hughes County Deputy State's Atty., Pierre, for plaintiff and appellee; Gary F. Colwill, Hughes County Deputy State's Atty., Pierre, on the brief.

Robert C. Riter, Jr., of Riter, Mayer, Hofer & Riter, Pierre, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL BACKGROUND/ISSUES

Appellant Michael Vogel (Vogel) was convicted of possession of more than one-half pound, but less than one pound, of marijuana after a non-jury trial in the circuit court for Hughes County. Vogel appeals his conviction and a sentence of two years in the State Penitentiary, contending that the trial court erred by finding no constitutional violation in State aerial and zoom lens photographic observations of marijuana plants within his home. The observations in question were a naked-eye sighting from an airplane, a subsequent aerial photographic run, and photography from a ridge behind Vogel's house. All three observations were made by Trooper Glen Miller of the State Highway Patrol.

Vogel urges that the use of zoom lenses to peer inside his home constituted an unreasonable search. He emphasizes that Trooper Miller was trespassing at the time of the third observation. These contentions create a constitutional issue of the reasonableness of the three police observations, as it relates to search and seizure law. Vogel filed various motions seeking to suppress the marijuana plants seized urging they were the fruits of an illegal search and seizure. A hearing was held upon these motions and the trial court ultimately entered a formal decision on the motions to suppress consisting of Findings of Fact, Conclusions of Law, and Order. We affirm.

## FACTS

On May 8, 1987, Trooper Glen Miller (Miller), an official pilot of the State Highway Patrol, flew over Vogel's geodesic dome residence in the course of a flight from Pierre to Sioux Falls.[1] He left the airport in such a manner that he could pass over his own house and, in so doing, flew over Vogel's residence, which is near the home of Trooper Miller. Trooper Miller, then at an altitude of approximately 500 feet, noticed green leafy plants which appeared to be marijuana inside the dome's windows. Trooper Miller's flight on this day had no investigative motive behind it. We note, at this point, that Trooper Miller had been trained in the aerial detection and surveillance of marijuana at a school sponsored by the United States Drug Enforcement Administration.

Without seeking a search warrant, the trooper made a second flight over the dome on May 14, 1987, and took photographs with a 35 mm camera augmented with a zoom lens. The resulting photographs revealed that plants, which appeared to him to be marijuana, were behind most of the dome's windows. Later, Trooper Miller acquired a more sophisticated camera and zoom lens from the State Division of Criminal Investigation (DCI) on May 27, 1987. He then drove to the vicinity of Vogel's dome with the DCI camera and stopped at the nearest residence to the west. He asked and received permission from a woman who lived at the neighboring house to go up on the ridge behind her house and take photographs. Trooper Miller proceeded to the top of the ridge between the residences. Although Trooper Miller crossed a fence close behind the house he stopped at, he crossed no border fence, and did not see any "no trespassing" signs en route to his vantage point. From a distance of approximately 75 yards, he took photographs of the dome's windows, which clearly showed marijuana plants filling

---

1. Pierre is the state capital of South Dakota and has a population of 12,000 people. The surrounding countryside is farm/ranch land which is sparsely inhabited.

most of two windows. Nothing was visible in the windows except the plants. His vantage point was probably, though the record is unclear, on property owned by a defunct corporation, the Hinkley Realty Co., Inc., of which Vogel had been an officer.

Trooper Miller then secured a no-knock search warrant, and, with other police agents, proceeded to enter the dome and seize ten marijuana plants, each located directly behind a window. They found that a watering system for the plants had been set up inside the dome, using water tanks and garden hoses. Vogel arrived home in the middle of the search whereupon he was arrested. Vogel's Motion to Suppress was denied.

## DECISION

Vogel argues that use of zoom lenses in photographing marijuana plants in the windows of his home violated a reasonable expectation of privacy that society should be prepared to observe, through application of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). As the plants were obviously within the curtilage of his home, where the Fourth Amendment extends maximum protection, Vogel insists that the observations which provided probable cause for the search warrant in this case were unreasonable searches and seizures. Additionally, Vogel contends that Trooper Miller's third observation was obtained through trespassing; consequently, the search was contrary to law.

■ Vogel's arguments are unconvincing. Miller's first overflight was not part of any investigative operation. His naked-eye sighting of the plant, which to his trained eye resembled marijuana, was wholly fortuitous. Also, Vogel has failed to establish that Miller's flight path violated any flight rules. Miller and his aircraft were at or above the minimum safe altitude (500 feet) for fixed-wing aircraft above sparsely populated areas. *See* 14 C.F.R. § 91.79(c). *See also Riley v. State*, 511 So.2d 282, 288 n. 10 (Fla.1987); *People v. Sabo*, 185 Cal.App.3d 845, 852, 230 Cal. Rptr. 170, 174 (1986) (citing *California v. Ciraolo, infra*). Both *Riley* and *Sabo* in-

validated close, low-level helicopter observations by police, but in this case, we are ruling on observations from a fixed-wing aircraft. As quoted below, fixed-wing aircraft have a different legal significance:

As we have seen, *Ciraolo's* fixed wing aircraft flight observation at 1,000 feet within the public navigable airspace is not intrusive of privacy.... Public navigable airspace as to helicopters is not defined as a function of altitude....

We judicially notice the unique capabilities of the helicopter to gambol in the sky—turning, curtsying, tipping, hummingbird-like suspended in space, ascending, descending and otherwise confounding its fixed wing brethren doomed to fly straight, turn in caution and glidingly descend.

*Sabo*, 185 Cal.App.3d at 852–53, 230 Cal. Rptr. at 174–75. *Riley* similarly distinguished helicopters from other aircraft: "We do not believe that the details observed here from the vantage point of a circling and hovering helicopter could just as easily have been discerned by any person casually flying over the area in a fixed-wing aircraft." *Riley*, 511 So.2d at 288. The key concept, then, is found in *California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986):

That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.... "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." [*Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967)].

*Ciraolo*, 476 U.S. at 213, 106 S.Ct. at 1812, 90 L.Ed.2d at 216–17. The United States Supreme Court, in *Ciraolo*, held aerial observation of areas within the curtilage of a home violated no reasonable expectation of privacy:

One can reasonably doubt that in 1967 Justice Harlan considered an aircraft

within the category of future "electronic" developments that could stealthily intrude upon an individual's privacy. In an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet. The Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the naked eye.

*Ciraolo*, 476 U.S. at 215, 106 S.Ct. at 1813, 90 L.Ed.2d at 218 (footnote omitted). In the present case, we note that Vogel took no precautions whatever to mask any view of his windows. He was using sunlight to aid him in his criminal activity, thereby converting his home into a greenhouse for growing marijuana.

■ The second observation, involving aerial photography with a zoom lens, was also permissible. The fact that the flight was undertaken with the intent to focus on Vogel's home is simply irrelevant, as noted in *Ciraolo:*

> The California Court of Appeal recognized that police have the right to use navigable airspace, but made a pointed distinction between police aircraft focusing on a particular home and police aircraft engaged in a "routine patrol." ... Whether this is a rational distinction is hardly relevant, although we find difficulty understanding exactly how respondent's expectations of privacy from aerial observation might differ when two airplanes pass overhead at identical altitudes, simply for different purposes. We are cited to no authority for this novel analysis or the conclusion it begat. The fact that a ground-level observation by police "focused" on a particular place is not different from a "focused" aerial observation under the Fourth Amendment.

*Ciraolo*, 476 U.S. at 214, 106 S.Ct. at 1813, 90 L.Ed.2d at 217 n. 2.

Vogel's argument that the use of zoom lens photography changes the result of this case is unsound.

> If, for example, a person places a marijuana plant directly on his window sill so that it is observable from the street, his expectation of privacy concerning the plant is not significantly different from that in the case described above where the plant was on the sun deck, and thus it is no search to scrutinize that plant with binoculars.

1 W.R. LaFave, *Search and Seizure*, § 2.2(c), at 340–41 (2d ed. 1987) (footnote omitted). As Vogel has made no showing that the cameras and lenses used in both this second aerial search and the subsequent ground reconnaissance were "sophisticated visual aids" or "special equipment not generally in use," this case is distinguishable from *United States v. Kim*, 415 F.Supp. 1252, 1255–56 (D.Haw.1976) (wherein an 800 mm telescope with a 60 mm opening was used to peer into a defendant's window—the agents were able to discern what the defendant was reading from a quarter of a mile away). We are not concerned in this case with sophisticated gadgetry. If the United States Supreme Court put its imprimatur on use of $22,000 aerial mapping cameras, as merely somewhat enhancing human vision (*see Dow Chemical Co. v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986)), the objection to the photography here is futile. Indeed, the marijuana plants were the only things visible in the window photos, greatly weakening Vogel's privacy argument. The second observation passes muster.

■ The third observation, even assuming that Miller was trespassing, is constitutionally firm. Vogel did not undertake any measures to shield his plants from a view on the hillside. A hilltop vantage point 75 yards from the home, with only grassland intervening, can hardly be considered within the curtilage:

> At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life," *Boyd v. United States*, 116 U.S. 616, 630, 29

L.Ed. 746, 6 S.Ct. 524 [532] (1886), and therefore has been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private.

*Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214, 225 (1984) (citations omitted). While *Oliver* dealt with penetration of a defendant's property to investigate marijuana fields, whereas here we are dealing with observation of a house from an open field, the point is that Trooper Miller could go where he did. Marijuana plants were clearly visible from the "open field." Anyone on the neighbor's property could have walked, unobstructed, to the hilltop, and seen the plants.

▆▆▆ The United States Supreme Court recently held that warrantless police observation, from a position in open fields, of a drug laboratory within a defendant's barn presented no Fourth Amendment violation:

> [S]tanding as they were in the open fields, the Constitution did not forbid them to observe the phenylacetone laboratory located in respondent's barn. This conclusion flows naturally from our previous decisions.
>
> Under *Oliver* and *Hester* [*v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924)], there is no constitutional difference between police observations conducted while in a public place and while standing in the open fields. Similarly, the fact that the objects observed by the officers lay within an area that we have assumed, but not decided, was protected by the Fourth Amendment does not affect our conclusion. Last Term, in *California v. Ciraolo,* 476 U.S. [207],

106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), we held that warrantless naked-eye aerial observation of a home's curtilage did not violate the Fourth Amendment. We based our holding on the premise that the Fourth Amendment "has never been extended to require law enforcement officers to shield their eyes when passing a home on public thoroughfares." *Id.,* at [213, 106 S.Ct. at 1812, 90 L.Ed.2d at 216]. Importantly, we deemed it irrelevant that the police observation at issue was directed specifically at the identification of marijuana plants growing on an area protected by the Fourth Amendment. *Id.,* at [213, 106 S.Ct. at 1813, 90 L.Ed.2d at 217].

*United States v. Dunn,* 480 U.S. 294, ——, 107 S.Ct. 1134, 1141, 94 L.Ed.2d 326, 337 (1987). Miller's trespass into Vogel's open fields outside the curtilage[2] does not, in itself, infringe Fourth Amendment rights:

> The law of trespass, however, forbids intrusions upon land that the Fourth Amendment would not proscribe. For trespass law extends to instances where the exercise of the right to exclude vindicates no legitimate privacy interest. Thus, in the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment.

*Oliver v. United States,* 466 U.S. at 183–84, 104 S.Ct. at 1744, 80 L.Ed.2d at 227–28 (footnote omitted). Under *Dunn, Ciraolo,* and *Oliver,* Miller's naked-eye and photographic observation, from an open field, of clearly visible marijuana plants was constitutionally permissible notwithstanding the fact that the plants were physically located within the curtilage of Vogel's home.

As to the zoom photography, the analysis regarding the second observation likewise holds true. In addition, Trooper Miller saw marijuana plants at almost all of the second-floor windows. He first identified the

---

**2.** The Court, in *Dunn,* opined that the extent of a home's curtilage should be determined by reference to four factors: 1) Proximity of the area claimed to be curtilage to the home; 2) whether the area is within an enclosure surrounding the home; 3) the nature of the uses to which the area is put; and 4) the steps taken by the resident to shield the area from observation by people passing by. 480 U.S. at ——, 107 S.Ct. at 1139, 94 L.Ed.2d at 334–35. Miller, on a grassy ridge 75 yards from the house, was not within the house's curtilage.

plants as marijuana by plain eyesight, and then photographed only two because they were the most convenient to his location. Vogel's motion to suppress was quite rightly denied. We cannot hold, under the facts before us, that the Fourth Amendment to the United States Constitution and art. VI, § 11, of the South Dakota Constitution were violated.

■ Lastly, we take this occasion to express that privacy interests must be protected. We realize there is a limit to permissible surveillances and searches. We obviously realize a person has a reasonable expectation of privacy within his/her home. Vogel made no effort to shield his marijuana plants from either an aerial or ground-level observation. While the back of his home faced uphill, the hilltop was not set off by fences, signs, or other indications that denial of free access was intended. If Trooper Miller had physically invaded the curtilage of Vogel's home or used exotic surveillance equipment, or if Vogel's marijuana plants had been less brazenly displayed, the result in this case might have been different. The two-pronged test of *Katz* is not met, for Vogel's expectation of privacy was unreasonable under these facts. This case was essentially developed upon observation by an officer of the law from public navigable airspace and open fields, and we can find no reversible error.

Affirmed.

WUEST, C.J., and MORGAN and MILLER, JJ., concur.

SABERS, J., concurs in part and dissents in part.

SABERS, Justice (concurring in part and dissenting in part).

All of the photographs taken of any items inside the Vogel home by Trooper Miller, while he was physically trespassing on Hinkley Realty property,* should be suppressed. These photographs were taken during a physical trespass without a search warrant. A neighbor's permission to an officer to trespass upon another's property is of little value in attempting to justify this warrantless photographic search. It is one thing to accept the following unchallenged testimony of Trooper Miller. In the course of a flight from Pierre to Sioux Falls, while flying a fixed-wing aircraft *at an altitude of 500 feet,* he claimed to have noticed green, leafy plants inside the dome's two by three foot windows, which he claimed to identify as marijuana. It is a completely different matter to use these illegally obtained photographs to support a search warrant.

Even the majority's quotation from *California v. Ciraolo,* 476 U.S. 207, 213, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210, 216 (1986), points out the problem:

> The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.

The obvious problem is that Trooper Miller was not passing by the Vogel home on a public thoroughfare. He was trespassing on Vogel/Hinkley property. Clearly, Vogel had a reasonable expectation of privacy within his home.

The majority relies on the "open fields" doctrine of *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), to establish the legitimacy of Trooper Miller's search. This exception to the warrant requirement applies only to situations where the police trespass upon the land to search an open field, not a police trespass to search the private home on that land. The *Oliver* Court's reasoning clearly sets out this crucial distinction:

> open fields do not provide the setting for those intimate activities that the [Fourth]

---

* Hinkley Realty Company is the owner of the home and the property upon which the officer took photos of the home. Michael Vogel is an officer of Hinkley Realty, the caretaker of the property and the resident of the home. The property contains approximately forty acres. The home is located on the east side of the property, approximately one-eighth of a mile north of U.S. highway 34 southeast of Pierre. To reach the home you must traverse a poorly-maintained, private, dead-end trail with big rocks. The closest neighbor is from one-fourth to three-fourths of a mile from the Vogel home.

Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, ... Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, ... would not be.

*Id.*, 466 U.S. at 179, 104 S.Ct. at 1741.

The majority contorts the reasoning in *Oliver* by attempting to apply what seems to be a type of "plain view" argument. The majority reasons that since the marijuana plants in the home were visible to Trooper Miller from an "open field" the search was proper. The "plain view" doctrine, or any analogy to the "plain view" doctrine, is inapplicable to this case. One of the three required elements for the application of "plain view" is that "the officer must discover incriminating evidence 'inadvertently,' which is to say, he may not 'know in advance the location of [certain] evidence[.]'" *Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502, 510 (1983) (*citing Coolidge v. New Hampshire*, 403 U.S. 443, 470, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564, 582 (1971)). Trooper Miller did not "inadvertently" discover the marijuana inside Vogel's home while searching an open field on the property. He trespassed on the property in order to photographically search for the marijuana in Vogel's home.

The majority also refers to *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) to support its holding. *Dunn*, however, involved the police search of a barn from an open field.

The *Dunn* Court specifically found that the barn was outside the curtilage of the home so as not to be "placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*, 107 S.Ct. at 1139. Despite the broad dicta of *Dunn* which the majority cites, the present case involves the search of a private home, not the search of a barn outside the home's curtilage as in *Dunn*. The Court in *Dunn* continued to emphasize the central Fourth Amendment protection afforded a home because of the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Id.*, 107 S.Ct. at 1139 (*quoting Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, 751 (1886)).

Even the State's argument concedes:

However, the State recognizes that it has some burden of establishing the fact that the officer was in a place where he had a right to be so for purposes of this argument we will concede the fact that the property in question was held by Hinkley Realty.

The State has failed to meet their burden, and the majority's attempt to disguise this unlawful search under the "open fields" exception is simply wrong.

Therefore, I respectfully dissent.