STATE of Wisconsin, Plaintiff-Appellant,

v.

William M. LANGE, Defendant-Respondent.

Court of Appeals

*No. 90-0743-CR. Oral argument September 20, 1990.—Decided
October 16, 1990.*

(Also reported in 463 N.W.2d 390.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Donald J. Hanaway,* attorney general, and *Sharon Ruhly,* assistant attorney general, and oral argument of *Sharon Ruhly.*

On behalf of the defendant-respondent, the cause was submitted on the brief and oral argument of *Kenneth L. Lund,* assistant state public defender.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J. The state of Wisconsin appeals nonfinal orders[1] suppressing 170 marijuana plants seized under a warrant. The warrant had been obtained in partial reliance on an earlier police seizure of one marijuana bud for testing, and the trial court determined that the earlier police seizure involved an impermissible fourth amendment violation of Lange's curtilage.

The state contends that the trial court erred by determining that the bud was seized within the curtilage of Lange's home and by suppressing evidence seized pursuant to a warrant independently supported by probable cause when all evidence of the questionable intrusion is excised. Lange contends that the trial court erred by determining that an aerial search of his property using vision-enhancing devices was permissible and urges that we deem this search a separate fourth amendment violation and an alternative ground for upholding the trial court's suppression order.

We conclude that the garden from which the marijuana bud was seized was within the curtilage of Lange's property under the Supreme Court's test in *United States v. Dunn,* 480 U.S. 294 (1987). We agree with the trial court that the visually-assisted aerial surveillance was not an infringement on Lange's fourth amendment rights. Finally, we hold that admissibility of evidence under the independent source doctrine is controlled by the test enunciated in *Murray v. United States,* 487 U.S. 533 (1988), and we remand this matter to the trial court to determine whether the investigating agent would have

---

[1] The state appeals pursuant to sec. 974.05(1)(d)2, Stats.

sought a search warrant if there had been no illegal intrusion.

In June of 1989, Darwin Krall, a conservation warden pilot for the state Department of Natural Resources, flew over William Lange's property while en route to Eau Claire. Lange's property includes a garden approximately thirty feet behind the house, surrounded on three sides by trees and dense undergrowth. Krall, using binoculars, noticed plants that he thought could be marijuana growing in the garden. Krall had received training in the aerial identification of marijuana plants. He did not act on the information at the time of his initial observation, but made a mental note of the location of Lange's farm.

In August 1989, the state Division of Criminal Investigation (DCI) enlisted Krall's aid in making flights aimed at drug eradication. On August 21, Krall again flew over Lange's property and programmed its location into his navigational computer. He also took photographs of the property, using a camera with a standard 50-mm. lens.

On August 22, Krall flew over the property a third time, accompanied by agent Jeffrey Kostner of the DCI. Both Kostner and Krall identified the plants growing in Lange's garden as marijuana. Krall again took photographs, this time using a telephoto lens. All three flights were in a fixed wing aircraft, and Krall never flew below an altitude 800–1,000 feet above the ground.

Later in the evening of August 22, Kostner, Krall and another DCI agent approached Lange's property through a cornfield. Kostner looked through an opening in the trees and observed seven-foot marijuana plants growing in the garden. Kostner testified that there was a snow fence, approximately four feet tall, extending partially along the east side of the garden, at the tree line.

Kostner then proceeded to enter the tree line and snip one of the marijuana buds. He testified that he clipped the bud while standing at the southeast end of the garden, south of the point where the snow fence ended. Lange testified that the nearest marijuana plant was located nine or ten feet beyond the snow fence. When Kostner returned to his office, he field-tested the sample bud, using the Duquenois-Levine test for tetrahydrocannabinols.

Kostner obtained a search warrant for Lange's house, outbuildings, curtilage and attached land. The warrant application stated that he was seeking marijuana, equipment used to grow and package marijuana, drug sales records, growing records, drying equipment and telephone toll records. In his affidavit in support of the warrant, Kostner indicated that his aerial and open field observations and the positive testing of the marijuana bud sample provided part of his probable cause basis for seeking the warrant.

Lange moved to suppress the evidence of the marijuana plants, which he contended were seized without a legal warrant. The trial court ruled that the aerial and open field observations that formed part of the basis for the warrant were permissible. It found that "up to that point, we had proper police conduct, and we had certainly, based on all evidence in front of this Court, sufficient evidence to support a warrant." The court concluded, however, that the clipping of the marijuana bud was an unconstitutional invasion of Lange's curtilage and ordered the suppression of the marijuana plants seized pursuant to the warrant.

## I. DETERMINATION OF CURTILAGE

The state contends that the trial court erred by determining that the bud was seized within the curtilage of Lange's home. There is some question as to the appropriate standard of review on this issue. Lange contends that the question whether a place is within the "curtilage" of the house is a question of fact, citing *Ball v. State,* 57 Wis. 2d 653, 661, 205 N.W.2d 353, 356 (1973). Findings of fact by a trial court shall not be set aside on appeal unless clearly erroneous. Section 805.17(2), Stats.

More recent Wisconsin case law, however, appears to call *Ball*'s holding into question, and suggests that the issue of whether a place forms part of the "curtilage" of a home is a matter of constitutional fact. *See, e.g., State v. Murdock,* 155 Wis. 2d 217, 226, 455 N.W.2d 618, 621 (1990) (whether the facts satisfy the constitutional requirement of reasonableness and whether a particular place is an area from which a defendant might secure a weapon are matters of constitutional fact). Constitutional facts depend on findings of historical fact. The latter are reviewed under the great weight/clearly erroneous standard. *State v. Griffin,* 131 Wis. 2d 41, 62, 388 N.W.2d 535, 543 (1986), *aff'd,* 483 U.S. 868 (1987). An appellate court exercises independent appellate review of constitutional facts. *Murdock,* 155 Wis. 2d at 226, 455 N.W.2d at 621.

The line between historical fact and constitutional fact is "often fuzzy at best." *Container Corp. v. Franchise Tax Bd.,* 463 U.S. 159, 176 (1983). The curtilage concept originated at common-law to extend the same protection to the area immediately surrounding a dwelling house as that extended to the house itself.

*Dunn,* 480 U.S. at 300. The concept of curtilage "plays a part . . . in interpreting the reach of the Fourth Amendment." *Id.* A constitutional fact is one whose determination is "decisive of constitutional rights." R. Aldisert, *The Judicial Process* 704 (1976) (citing W. Bishin & C. Stone, *Constitutional Facts,* Law Language & Ethics 365–70 (1972)).

■■■
We need not decide this issue because, under either standard, we affirm the trial court's finding that the tree line surrounding Lange's garden marked his curtilage. The United States Supreme Court has provided courts with a four-factor test to aid in the determination of curtilage questions. *Dunn,* 480 U.S. at 301. We analyze the trial court's findings in light of the *Dunn* factors.

First, we examine the proximity of the area claimed to be curtilage to the home. The trial court found that the garden was within ten yards of Lange's home. The state concedes on appeal that the proximity of the garden is one factor that might support a determination that the garden was within the curtilage of the house.

Second, we inquire whether the area is included within an enclosure surrounding the home. The trial court found that "it's completely surrounded by heavy, heavy tree line, not just some shelter belt, but thoroughly dense trees on the better part of three sides and scattered trees and brush along the remainder, that clearly delineates a living area." The state argues that *Dunn* requires the enclosure to surround both the house and the garden, and a three-sided enclosure does not suffice to meet this requirement. Whatever the merits of the state's interpretation of *Dunn,* the undisputed evidence demonstrates that the house and garden stood alone in the middle of farm fields, surrounded except for the driveway entrance

on all four sides by trees, with the concentration of trees heavier on the three sides that also enclosed the garden.

The state also argues that the existence of a four-foot-high snow fence, constructed of spaced pickets and wire, between the house and the garden served to separate the areas and remove the garden from the curtilage of the house. We disagree. The undisputed evidence indicates that this fence did nothing to "screen" the garden from the house; in fact, vegetation behind the fence was clearly visible from the house's porch. The trial court's finding that the snow fence did not demarcate Lange's curtilage was not clearly erroneous.

Therefore, the trial court could correctly conclude that the garden here was included within an enclosure surrounding the home. Thus, the second factor of the *Dunn* test supports a determination that the garden is within Lange's curtilage.

Third, we ask the nature of the uses to which the area is put. *Dunn* directs that we examine whether the area "was . . . being used for intimate activities of the home." *Id.* at 302. Here, the state is in the anomalous position, after urging this court in its analysis of the second factor of the *Dunn* test to examine the entire area encompassing the home as well as that land claimed to be curtilage, of now asking that we examine only the uses to which the *garden* was put, *i.e.*, growing marijuana. The trial court found it significant that laundry was hanging on a line even farther from the house than the garden. We agree. Lange testified at trial that the garden area itself contained, in addition to the marijuana, a variety of garden vegetables including corn, tomatoes and squash. The "use" factor weighs in favor of a determination that the garden is within Lange's curtilage.

Fourth, we determine the steps taken by the resident to protect the area from observation by people passing by. The trial court found:

> You have a whole area that's open to farming and tillage, and here in the middle of this huge farmland, acres and acres of farmland, was an area that was intentionally planted to cordon off a living area, and within those tree lines, there is an interesting pattern of—between the buildings and trees and areas of a private area. That's what I think the ancient concept or medieval concept of curtilage is all about, and I think to find otherwise would do an injustice to the privacy of individuals.

The state argues that there is nothing in the record to indicate that Lange planted the trees in question. This is not dispositive of our inquiry into the fourth *Dunn* factor. Whether Lange planted the trees himself, or merely chose to live on the property because the trees afforded privacy, he took steps to protect the area from observation by people passing by. We conclude that an analysis of all the *Dunn* factors supports the trial court's determination that the garden was located within the curtilage of Lange's home.

In its brief, the state argued that, even were the bud determined to be within the curtilage of Lange's home, the trial court erred by finding that Lange had a sufficient subjective expectation of privacy in the marijuana garden to warrant fourth amendment protection. At oral argument, the state conceded that where an area is clearly within the curtilage under the *Dunn* analysis, it is entitled to fourth amendment protection. The concession is appropriate, in view of our supreme court's holding in *State v. Walker,* 154 Wis. 2d 158, 184, 453 N.W.2d 127, 138 (1990) (warrantless arrest within the curtilage

of a person's home is unlawful absent probable cause and exigent circumstances).

## II. VISUALLY-ASSISTED AERIAL SEARCH

Lange contends that the aerial search of his property using vision-enhancing devices was impermissible and urges that we deem this search a separate fourth amendment violation and an alternative ground for upholding the trial court's suppression order. We decline to do so.

The *Dunn* factors do not address the reasonable expectation of privacy from aerial surveillance of the curtilage. A different body of United States Supreme Court case law controls this inquiry.

Minimum altitudes for fixed wing aircraft flying over Barron County is 500 feet above the terrain. The plane's altitude during Krall's three flyovers of Lange's property never fell below 800–1,000 feet above the ground. Krall used binoculars and a camera with a standard 50–mm. lens and a 90–250 zoom lens in making his observations. Lange testified that in the six years he resided on the property, he had never seen an airplane or helicopter overhead until a defense expert circled his property after charges were filed. He further testified that he did not expect anyone to fly over his residence. Lange argues that the use of vision-enhancing devices, coupled with the use of aircraft where overflights are not expected, combine to violate his reasonable expectation of privacy.

We first address Lange's challenge to the use of vision-enhancing devices during aerial surveillance. Naked eye observations from a fixed wing plane flying at 1,000 feet where agents used a 35–mm. camera to take

621

photographs did not violate fourth amendment protections. *California v. Ciraolo,* 476 U.S. 207, 209–13 (1986). Naked eye observations from a helicopter 400 feet above a partially covered greenhouse located ten to twenty feet from a defendant's home did not amount to a search for fourth amendment purposes. *Florida v. Riley,* 109 S.Ct. 693, 696–97 (1989). Where an observation is made from a plane flying within navigable airspace for a fixed wing aircraft, a defendant does not have a reasonable expectation of privacy. *Id.* at 696 (plurality opinion).

The United States Supreme Court has stated that "[t]he use of bifocals *[sic],* field glasses or the telescope to magnify the object of a witness' vision is not a forbidden search or seizure, even if they focus without his knowledge or consent upon what one supposes to be private indiscretions." *On Lee v. United States,* 343 U.S. 747, 754 (1952); *see also State v. Peck,* 143 Wis. 2d 624, 640, 422 N.W.2d 160, 166–67 (Ct. App. 1987) (binoculars or other vision enhancement devices); *State v. Vogel,* 428 N.W.2d 272, 275 (S.D. 1988) (camera and zoom lens); *United States v. Bassford,* 601 F.Supp. 1324, 1328 (D. Me. 1985), *aff'd,* 812 F.2d 16 (1st Cir.), *cert. denied,* 481 U.S. 1022 (1987) (binoculars).

We agree with Lange's contention that "[t]here must be a limit to the degree the government can intrude upon a person's home and curtilage with 'high-tech' equipment." As Lange points out, while the use during aerial surveillance of expensive highly sophisticated equipment, including a magnifying map-making camera, has been held not to violate fourth amendment protections, *see Dow Chemical Co. v. United States,* 476 U.S. 227, 237–39 (1986), the *Dow* Court distinguished the level of constitutional protection extended to an indus-

trial property, like the one involved in *Dow,* from that afforded to protect an individual's home. *Id.* at 237–38. We specifically limit our holding here to approval of the use of standard binoculars and cameras equipped with generally available standard and zoom lenses.

We next address Lange's claim that the use of aircraft where overflights are not expected violated fourth amendment protections. Lange bases his claim on language in Justice O'Connor's concurring opinion in *Riley:* "If the public rarely, if ever, travels overhead at such altitudes, the observation cannot be said to be from a vantage point generally used by the public and [the defendant] cannot be said to have 'knowingly expose[d]' his [curtilage] to public view." *Id.* at 698–99 (O'Connor, J., concurring). Lange argues that the state offered no evidence to rebut his testimony that he had never seen flights over his property and that he did not expect anyone to fly over his residence.

Krall testified that his first flight over Lange's property was part of his flight plan en route to Eau Claire. He was not on a drug enforcement search mission in remote areas. The court could and did infer from this testimony that overflights of Lange's property were not rare. We conclude that Lange did not have a reasonable expectation of privacy from observations made in a fixed wing aircraft flying no lower than 800 feet, where overflights were not rare and the pilot was within navigable airspace specified by law.

### III. INDEPENDENT SOURCE RULE AND *MURRAY*

The state contends that the trial court erred by not excising from the warrant application information relat-

ing to the illegal entry and then determining whether the warrant was valid. It finds support for its contention in both *United States v. Karo,* 468 U.S. 705 (1984), and *State v. O'Brien,* 70 Wis. 2d 414, 234 N.W.2d 362 (1975). In response, Lange argues that a more recent Supreme Court decision, *Murray v. United States,* controls.

In *Murray,* the Supreme Court held that evidence initially discovered during an illegal search, but subsequently acquired through an independent and lawful source, is admissible. *Id.* at 539. The *Murray* Court described the test to be applied as follows:

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

*Id.* at 542 (footnote omitted).

The state first attempts to distinguish *Murray* from this case by noting that, in *Murray,* the affidavit in support of the warrant failed to disclose the illegal intrusion while here, the affidavit informed the magistrate of the seizure and testing of the marijuana bud. *Murray's* rationale, however, covers both situations. The Court stated:

> An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both

> seen and unseen, since his action would add to the
> normal burden of convincing a magistrate that there
> is probable cause the *much more onerous burden of
> convincing a trial court that no information gained
> from the illegal entry affected either the law enforce-
> ment officers' decision to seek a warrant or the mag-
> istrate's decision to grant it.*

*Id.* at 540 (emphasis added).

We acknowledge that the *Murray* Court needed only to address the standard to be applied when warrants are obtained after an illegal intrusion, but without disclosing that intrusion, in order to resolve the issue before it.[2] *Murray* went further, however, to explicate a standard to be used whenever admissibility of evidence under the independent source doctrine is at issue. The decision of a court of last resort is not dictum, even if it is not decisive of the primary issue, if it is germane to that issue. *State v. Lee,* 119 Wis. 2d 355, 359, 351 N.W.2d 755, 757 (Ct. App. 1984), *aff'd,* 122 Wis. 2d 266, 362 N.W.2d 149 (1985).

■ The state next attempts to distinguish *Murray* on the grounds that we need not apply the independent source doctrine because we are confronted with facts "involving a single line of investigation in which probable cause exists prior to the allegedly illegal act, but the investigation proceeds through the allegedly illegal act." The state claims that in *Murray,* the exact point at which probable cause existed is not clear. We are not persuaded. While the facts recited by the Supreme Court may not clearly disclose when probable cause existed in the *Murray* case, those recited by the first circuit indicate that the police had probable cause to support a

---

[2]*Murray* makes no reference at all to either *Karo* or *O'Brien.*

search warrant prior to their illegal intrusion. *See United States v. Moscatiello,* 771 F.2d 589, 595 (1st Cir. 1985); *vacated and remanded on other grounds,* 476 U.S. 1138 (1986), *aff'd sub nom. United States v. Carter,* 803 F.2d 20 (1st Cir. 1986), *vacated and remanded sub nom. Murray v. United States,* 487 U.S. 533 (1988). We cannot distinguish *Murray* on these grounds.

Because we conclude that *Murray* controls, we must apply its two-pronged test to determine the admissibility of evidence under the independent source doctrine. We first examine whether the agent would have sought the warrant if he had not made the illegal entry, and then inquire if information obtained during that entry affected the magistrate's decision to issue the warrant. *Id.* at 540. Lange contends that there is sufficient undisputed evidence in the record to invalidate the search on either of these two grounds. We do not agree.

First, with respect to whether the agent's decision to seek the warrant was prompted by what he had seen during the initial entry, Lange cites Kostner's testimony at the suppression hearing:

> Q. Why not obtain a warrant between the time you saw it from the air and the time you went back to sample it?
>
> A. Could you repeat the question? I missed the first part.
>
> Q. Well, didn't you have time to get a warrant, a search warrant from the time you observed it with Pilot Krall? Why not do that, rather than go in there and sample it without a warrant?
>
> A. I judged not to go and get the warrant immediately to protect the—

Q. Did you talk to the District Attorney before you made that decision?

A. No, I did not.

Q. What were you going to protect by not getting the warrant?

A. To protect in case it was not marijuana.

Q. I thought you said that you could tell for sure from the air that it was.

A. Not absolutely positive.

Q. Could you tell absolutely positively when you were standing in the cornfield looking into the garden whether it was marijuana or not?

A. No, it appeared to be marijuana.

Q. Why not get a warrant, then, before you sampled it?

A. I chose not to.

Q. Why?

A. Because of my procedure. I just chose not to.

Q. No real reason?

A. I just chose not to get a warrant.

While Kostner's testimony reveals that he chose to pursue an "absolutely positive" standard rather than a "probable cause" standard to define the extent of his investigation, it does not address the critical inquiry described in *Murray*. It is possible that Kostner would have relied on a probable cause standard if absolute certainty could not be legally achieved. Because we do not make factual findings, the matter is remanded to the trial court to make an explicit finding as to whether

627

Kostner would have sought a warrant if he had not clipped the bud. *See id.* at 542 n.3.

Second, with respect to whether information obtained during that entry affected the magistrate's decision to issue the warrant, Lange argues that because the judge who ruled to suppress the evidence and the magistrate who issued the search warrant are the same person, sufficient evidence exists in the record to enable us to determine as a matter of law that the magistrate's decision to issue the warrant was affected by the information obtained during the illegal search. On the contrary, we conclude that because the trial court found that "up to that point, we had proper police conduct, and we had certainly, based on all evidence in front of this Court, sufficient evidence to support a warrant," we conclude as a matter of law that the magistrate's decision to issue the warrant was *not* affected by information obtained during the illegal search.[3] Accordingly, we do not remand to the trial court for a finding on this matter.

The order of the trial court is affirmed in part, reversed in part and remanded for an explicit finding as to whether Kostner would have sought a warrant if he had not clipped the bud.

*By the Court.*—Orders affirmed in part; reversed in part and cause remanded with directions.

LaROCQUE, J. *(dissenting).* I dissent. The *Murray* decision has no application here. *Murray* deals with the police failure to mention to the issuing magistrate

---

[3]We understand the second prong of the *Murray* formulation to apply the objective test described in *Karo* and *O'Brien.* The inquiry is directed toward whether sufficient probable cause existed for a reasonable magistrate to have grounds for the issuance of a warrant absent the illegal intrusion.

the fact of their illegal forced entry into the subject warehouse where they observed hundreds of bales of marijuana. This case is controlled by *Karo*. That case also involved an illegal pre-warrant police search, but those facts were presented to the magistrate in the search warrant affidavit. *Karo* holds that if sufficient untainted evidence is included in the application for a search warrant, the warrant is valid. The majority here notes that *Murray* makes no mention of *Karo*, yet, if the facts here are controlled by *Murray*, then *Karo* is overruled. I believe that *Murray* does not mention *Karo*, decided only four years earlier, because the cases deal with different circumstances.

I would reverse the order suppressing the evidence based upon the conclusion reached by both the trial court and this court that there was sufficient evidence to support a search warrant without the clipped marijuana bud.