# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP1317-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>　　　　　Plaintiff-Respondent,<br>　　v.<br>Daniel J. Van Linn,<br>　　　　　Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 395 Wis. 2d 294,953 N.W.2d 116
(2020 – unpublished)

| | |
|---|---|
| OPINION FILED: | March 24, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 27, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Oconto |
| JUDGE: | Michael T. Judge |

JUSTICES:

DALLET, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, REBECCA GRASSL BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. ANN WALSH BRADLEY, J., filed a dissenting opinion.

NOT PARTICIPATING:

ATTORNEYS:

　　For the defendant-appellant-petitioner, there were briefs filed by *Andrew R. Hinkel*, assistant state public defender. There was an oral argument by *Andrew R. Hinkel*.

　　For the plaintiff-respondent, there was a brief filed by *John W. Kellis*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *John W. Kellis*.

**2022 WI 16**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2019AP1317-CR
 (L.C. No. 2017CF44)

STATE OF WISCONSIN     :    IN SUPREME COURT

**State of Wisconsin,**

     **Plaintiff-Respondent,**

**FILED**

  v.

**MAR 24, 2022**

**Daniel J. Van Linn,**

Sheila T. Reiff
Clerk of Supreme Court

     **Defendant-Appellant-Petitioner.**

DALLET, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, REBECCA GRASSL BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. ANN WALSH BRADLEY, J., filed a dissenting opinion.

REVIEW of a court of appeals' decision. *Affirmed.*

¶1 REBECCA FRANK DALLET, J. After crashing his car, Daniel Van Linn was taken to the hospital, where two blood tests were performed: the first one by the hospital for diagnostic and treatment purposes; a later one at the direction of a sheriff's deputy for investigative purposes. Both blood tests revealed that Van Linn's blood-alcohol concentration (BAC) was over the legal limit. The circuit court suppressed the results of the deputy's blood test, concluding that the deputy's blood draw violated the

Fourth Amendment because the deputy did not have a warrant. The State then subpoenaed the hospital for Van Linn's medical records, which included the hospital's diagnostic blood-test results. Van Linn argues that those results should be suppressed under the Fourth Amendment's exclusionary rule because the State subpoenaed the hospital only after it learned from the deputy's unlawful blood draw that Van Linn's BAC was over the legal limit. The issue is whether hospital's blood-test results are nevertheless admissible under the independent-source doctrine, an exception to the exclusionary rule. We hold that they are, and therefore affirm the court of appeals.

I

¶2 Around 2:00 a.m. one Sunday morning, the Oconto County Sheriff's Office responded to a call about a car accident on a rural road in the Town of Mountain. When a deputy arrived, he found Van Linn's car crashed into the back of a cabin. The subsequent investigation revealed that Van Linn was driving to his cabin when he thought he saw an oncoming car in his lane and swerved to avoid it. He veered off the road and into a ditch, where he hit a tree. He then drove back onto the road, crossing both lanes of traffic before continuing into a ditch on the other side of the road, over a hill, and through a field, eventually crashing into the back of someone's cabin.

¶3 Ambulance personnel found Van Linn lying on the ground across the street. He had a bump and some blood on his forehead and his hands were bleeding. Van Linn claimed to know nothing

2

about the accident and denied that he was driving. The deputy noted a "moderate odor of alcohol" coming from Van Linn, and Van Linn told the deputy that he had drank "two beers" earlier that evening. The deputy learned that because Van Linn had four prior OWI (operating while intoxicated) convictions, he was subject to a BAC limit of 0.02 and his driving privileges were revoked.[1]

¶4 Van Linn was taken to the hospital. At 3:55 a.m., hospital personnel performed a "diagnostic workup," which included drawing Van Linn's blood. The results of that blood test revealed that Van Linn's BAC was 0.226. Not long after, the deputy arrived at the hospital and, based on his investigation at the accident scene, arrested Van Linn for his fifth OWI. At the time of Van Linn's arrest, the deputy was unaware of the hospital's blood draw and its results.

¶5 Following his arrest, Van Linn admitted that he had in fact been driving and that he was the one who called the police to report the crash. The deputy asked Van Linn to consent to a blood draw, which Van Linn refused. Nevertheless, at his lieutenant's direction and without a warrant, the deputy had Van Linn's blood drawn at approximately 4:15 a.m., about twenty minutes after the hospital had taken Van Linn's blood. A test of this second sample showed that Van Linn's BAC was 0.205.

---

[1] The legal BAC limit in Wisconsin is typically 0.08. Wis. Stat. § 340.01(46m)(a) (2019-20). Persons with at least three OWI convictions are subject to a BAC restriction of 0.02. See § 340.01(46m)(c). The conditions under which a person's driving privileges can be revoked are laid out in § 343.31. All statutory references are to the 2019-20 version.

3

¶6 In the circuit court,[2] Van Linn moved to suppress the results of the deputy's blood draw because the deputy did not have a warrant and no exceptions to the warrant requirement applied. The State argued that the deputy did not need a warrant because the natural dissipation of alcohol in Van Linn's bloodstream was an exigent circumstance. The circuit court granted Van Linn's motion, suppressing the results of the deputy's warrantless blood draw on the grounds that no exigent circumstances justified the deputy's failure to get a warrant.[3]

¶7 Three months later, the State asked the circuit court to issue a subpoena to the hospital for Van Linn's medical records, which included the results of the hospital's diagnostic blood test.[4] The State submitted an accompanying affidavit asserting there was probable cause for the subpoena because the deputy smelled alcohol on Van Linn at the scene, Van Linn had a reduced BAC restriction, and Van Linn admitted he had been drinking before the accident. The affidavit referenced the deputy's blood draw and noted that testing of the sample showed that Van Linn's BAC was over the legal limit. Van Linn moved to quash the subpoena, arguing that the State's subpoena request violated the circuit

---

[2] The Honorable Michael T. Judge of the Oconto County Circuit Court presided.

[3] The State does not contest the circuit court's conclusion that the deputy's warrantless blood draw violated the Fourth Amendment.

[4] Wisconsin Stat. § 968.135 authorizes the circuit court to issue a subpoena at the State's request and upon a showing of probable cause.

4

court's suppression decision because it sought evidence that was "necessarily related to the previously suppressed blood draw." But the subpoena was issued and executed before the court held a hearing on Van Linn's motion to quash. The hospital turned over Van Linn's treatment records, including the results of the hospital's diagnostic blood test.[5]

¶8 Van Linn then filed a motion to suppress the hospital's blood-test results. He argued that the State was attempting to circumvent the circuit court's prior suppression decision by obtaining the "same information"——his BAC——that it learned from the deputy's unlawful blood draw. Van Linn urged that suppressing the hospital's blood test was necessary to "give[] proper purpose and effect" to the court's prior decision. The circuit court denied Van Linn's motion on statutory grounds without addressing whether its prior suppression of the deputy's unlawful blood draw precluded the State from acquiring the results of the hospital's blood test.[6]

---

[5] The circuit court eventually held a hearing, concluding that the motion was moot since the hospital had already released the records.

[6] Van Linn also argued that he had an absolute privilege under Wis. Stat. §§ 146.82 and 905.04(2) to keep his medical records confidential. The circuit court determined, however, that the exceptions to that privilege in §§ 148.82(2)(a)4. and 905.05(4)(f) applied. The former allows for the release of privileged medical records "under a lawful order of a court," and the latter states that "[t]here is no privilege concerning the results of or circumstances surrounding any chemical tests for intoxication or alcohol concentration." Van Linn has not challenged this part of the circuit court's decision.

5

¶9 On appeal, Van Linn argued that the United States Supreme Court's precedent——namely, Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920), and Murray v. United States, 487 U.S. 533 (1988)——required the circuit court to suppress the hospital's blood-test results because the State was "prompted" by the suppression of the deputy's unlawful blood draw to subpoena the hospital for his medical records. He further claimed that the State subpoenaed the hospital only because it knew from the deputy's unlawful blood draw that his BAC was over the legal limit. Van Linn explained that Silverthorne Lumber and Murray prevented the State from using that knowledge as the reason for its subsequent subpoena request. The court of appeals rejected those arguments, holding that the independent-source doctrine, as described in Silverthorne Lumber and Murray, applied. State v. Van Linn, No. 2019AP1317-CR, unpublished op. (Wis. Ct. App. Nov. 17, 2020). It reasoned that, based on the deputy's investigation at the accident scene, the State had probable cause to believe that Van Linn was operating his car while intoxicated before it had "any inkling of what a blood test would reveal." Id., ¶24. Although the State obtained the hospital's blood-test results only after it knew the results of the deputy's blood test, the hospital's blood test was an independent source of Van Linn's BAC because it was "created completely independently" of the deputy's unlawful blood draw. Id., ¶20. The court of appeals held that "the purpose of the exclusionary rule would not be effectuated" by suppressing the hospital's blood test "merely because it was of the same nature" as the unlawfully obtained

6

evidence, because suppressing it would put the State in a worse position than it was in absent the deputy's unlawful conduct. Id.

II

¶10 Whether the exclusionary rule applies to the hospital's blood test is a question of "constitutional fact," which we review under a mixed standard of review. See State v. Jackson, 2016 WI 56, ¶45, 369 Wis. 2d 673, 882 N.W.2d 422. We accept the circuit court's factual findings unless they are clearly erroneous. State v. Carroll, 2010 WI 8, ¶17, 322 Wis. 2d 299, 778 N.W.2d 1. Determining whether those facts amount to a Fourth Amendment violation is a question of law that we review de novo. Id. (adding that we nevertheless benefit from the lower courts' constitutional analyses).

III

¶11 The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. When the State obtains evidence in violation of the Fourth Amendment, that evidence typically must be suppressed under the exclusionary rule. See State v. Prado, 2021 WI 64, ¶56, 397 Wis. 2d 719, 960 N.W.2d 869. The exclusionary rule can apply to both evidence discovered during an unlawful search or seizure and evidence discovered only because of what the police learned from the unlawful activity, also referred to as "fruit of the poisonous tree." State v. Knapp, 2005 WI 127, ¶24, 285 Wis. 2d 86, 700 N.W.2d 899. Not all Fourth Amendment violations, however, justify

7

applying the exclusionary rule. Rather, the rule applies when excluding the unlawfully obtained evidence will "meaningfully deter" police misconduct such that interfering with the criminal justice system's truth-seeking objective is justified. Prado, 397 Wis. 2d 719, ¶¶57-58 (quoting Herring v. United States, 555 U.S. 135, 144 (2009)). Whenever the exclusionary rule applies, the scope of the remedy is limited to preventing the State from "profit[ing] from its illegal activity" without placing the State "in a worse position than it would otherwise have occupied" absent its illegal conduct. Murray, 487 U.S. at 542; Carroll, 322 Wis. 2d 299, ¶44. It follows that excluding illegally obtained evidence "does not mean that the facts thus obtained become sacred and inaccessible," provided the State's knowledge of them is gained from a source unrelated to the State's illegal conduct. Silverthorne Lumber, 251 U.S. at 392.

¶12 That idea is the foundation of the independent-source doctrine. E.g., Murray, 487 U.S. at 537. The doctrine is an exception to the exclusionary rule in that it allows for the admissibility of evidence or information tainted by an illegal evidence-gathering activity when the State otherwise acquires the same information——or "rediscover[s]" it——by lawful means "in a fashion untainted" by that illegal activity. See id. at 537-38, 541-42; Silverthorne Lumber, 251 U.S. at 392. Subsequent lawful means, such as a subpoena, are "untainted" when the State can show that the illegal conduct neither "affected" the circuit court's decision to approve its subpoena request nor "prompted" the State's decision to seek a subpoena in the first place. See, e.g., United

8

States v. Markling, 7 F.3d 1309, 1315-16 (7th Cir. 1993). The former question turns on "whether the [subpoena's supporting affidavit] contain[s] sufficient evidence of probable cause without the references to the tainted evidence." See United States v. Huskisson, 926 F.3d 369, 375-76 (7th Cir. 2019); Carroll, 322 Wis. 2d 299, ¶44. Van Linn concedes that although the supporting affidavit referenced his BAC as discovered by the deputy's unlawful blood draw, the affidavit establishes probable cause for the subpoena without that reference. Our analysis therefore focuses on the latter question of whether the State's decision to seek the subpoena was prompted by what it learned from the deputy's unlawful blood draw. See United States v. Johnson, 994 F.2d 980, 987 (2d Cir. 1993) ("What is key is that [law enforcement's unlawful conduct] did not result in the government obtaining evidence it would not have otherwise obtained.").

¶13 Van Linn argues that the State's decision to subpoena his medical records was "motivated specifically" by the knowledge it gained from the deputy's unlawful blood draw——that his BAC was over the legal limit. According to Van Linn, if the deputy had not unlawfully drawn Van Linn's blood, the State would not have known that the hospital's blood test would show he had a prohibited BAC and, therefore, "would have had no reason to seek a subpoena" for his medical records.

¶14 Murray, however, demonstrates that the independent-source doctrine can apply even though the State knew the hospital's blood test would show an unlawful BAC. In Murray, federal agents found marijuana during a warrantless search of a warehouse that

9

they suspected housed a drug-trafficking operation.  The agents then applied for a search warrant, but included in the warrant application only information they knew prior to their warrantless entry.  A magistrate approved the warrant, and when the agents executed it, they "rediscovered" the marijuana.  487 U.S. at 535-36.  The Court held that the marijuana evidence was admissible because, although the agents first discovered the marijuana during an unlawful search, they rediscovered it while executing a valid warrant.  And the agents had probable cause for the warrant based on what they knew prior to the unlawful search.  Id. at 541-42. In other words, neither the agents' decision to seek the warrant nor the magistrate's issuance of the warrant was "prompted by what [the agents] had seen during the [unlawful] entry"——even though the unlawful entry gave the agents a preview of what they would find when executing the warrant.  Id. (adding that, under such circumstances, "there [was] no reason why the independent source doctrine should not apply").  Thus, Murray teaches that the independent-source doctrine applies when the State has a separate reason to seek the challenged evidence apart from the knowledge it gains from an unlawful search.  See id.

¶15  Here, the State had ample reasons to subpoena Van Linn's medical records for evidence of OWI, apart from what it learned from the deputy's unlawful blood draw.  At the accident scene, the deputy found Van Linn's car crashed into the back of a cabin.  His investigation revealed that Van Linn had veered off the road and into a ditch, where he hit a tree.  The deputy smelled an "intoxicant" on Van Linn, and Van Linn admitted to having had "a

10

couple of beers."  While Van Linn was en route to the hospital, the deputy also learned that Van Linn had a reduced BAC restriction of 0.02.  Moreover, the deputy arrested Van Linn for OWI prior to conducting the unlawful blood draw.  Similar to the agents' unlawful entry in Murray, the testing results of the deputy's unlawful blood draw "only served to confirm [the State's] prior suspicions":  that Van Linn's BAC was over the legal limit.  See United State v. Pike, 523 F.2d 734, 736 (5th Cir. 1975) (declining to exclude evidence the FBI lawfully rediscovered because, prior to an earlier, illegal search that revealed identical information, the FBI's investigation had "already focused" on the defendant for the same crime); Murray, 487 U.S. at 535–36, 541.  Stated differently, the State's decision to subpoena Van Linn's medical records was not prompted by what it learned from the deputy's unlawful blood draw.  See Murray, 487 U.S. at 541.[7]

¶16  Granted, the State did not subpoena Van Linn's medical records until after the circuit court suppressed the deputy's unlawful blood draw.  Van Linn argues that the State's subpoena is therefore the "direct result" of the deputy's unlawful conduct

---

[7] This conclusion is consistent with how other courts have applied Murray.  See, e.g., United States v. Moody, 664 F.3d 164, 167—68 (7th Cir. 2011) ("no indication" that illegal search in 2007 of defendant's cell phone records had "any bearing" on 2009 subpoena for the same records); Johnson, 994 F.2d at 987 (agents' decision to get warrant was prompted by the "obvious relevance" of what might be on audiotape recordings, not by the agents' unlawfully listening to the recordings before getting a warrant); United States v. Herrold, 962 F.2d 1131, 1140–41 (3d Cir. 1992) (police had evidence, prior to the unlawful search, that made it "inconceivable" they would not have lawfully discovered the same evidence).

11

because, but for that conduct, there would have been nothing for the circuit court to suppress. And but for the circuit court's suppression decision, the State would not have subpoenaed the hospital. We hold that, despite the timing of the State's subpoena request, suppression is not justified for two reasons.

¶17 First, in the exclusionary-rule context, the U.S. Supreme Court has rejected the strict but-for causality Van Linn presses here. See Wong Sun, 371 U.S. at 487-88 (evidence should not be excluded "simply because it would not have come to light but for the illegal actions of the police"); United States v. Carter, 573 F.3d 418, 423 (7th Cir. 2009). The "more apt question" for whether the exclusionary rule applies is: did the State "exploit[]" the deputy's unlawful conduct? See Wong Sun, 371 U.S. at 487-88. In this case, the State did not exploit the deputy's illegal conduct because, as explained above, the State had reasonable grounds to suspect Van Linn of OWI prior to anyone drawing his blood. See also State v. Dasen, 155 P.3d 1282, 1286 (Mont. 2007) (explaining that although "the invalidity of the first search necessitated a second [search], the State nevertheless possessed sufficient independent information to 'purge the taint' of the first search"). Additionally, the blood-test evidence contained in Van Linn's medical records is "untainted" by the deputy's unlawful conduct because the hospital drew Van Linn's blood for its own diagnostic and treatment purposes, not at the direction of law enforcement. See Segura v. United States, 468 U.S. 796, 813-14 (1984); cf. State v. Ravotto, 777 A.2d 301, 311 (N.J. 2001) (rejecting the State's independent-source argument

12

because the hospital drew the defendant's blood only at a police officer's request).

¶18 Second, suppressing the hospital's blood-test results would not further the purpose of the exclusionary rule, which is to deter police misconduct. The circuit court's suppression of the deputy's warrantless blood draw remedied the police misconduct in this case. Suppressing the hospital's diagnostic blood test, however, would have no further deterrent effect because it involved no police conduct at all, let alone misconduct. See Prado, 397 Wis. 2d 719, ¶57; Davis v. United States, 564 U.S. 229, 237 (2011) ("Real deterrent value is a 'necessary condition for exclusion' . . . .") (quoted source omitted). Moreover, suppressing the hospital's blood test runs counter to the exclusionary rule because it would put the State in a worse position than it occupied absent the deputy's unlawful conduct.[8] See Murray, 487 U.S. at 537-38.

¶19 Accordingly, we conclude that the results of the hospital's blood test are admissible under the independent-source doctrine. The State's decision to subpoena the hospital for Van Linn's medical records was not prompted by the deputy's unlawful

---

[8] The dissent oversimplifies the issue in asserting that the independent-source doctrine allows law enforcement to "circumvent a suppression decision by simply looking for the same information in a different place." See dissent, ¶33. The doctrine requires law enforcement to have had a reason to look elsewhere for the same information independent of the unlawful conduct that led to the suppression decision. That requirement ensures the police do not get a "do-over" simply because "evidence gained through an unconstitutional search is suppressed." See id., ¶7.

13

conduct, because the State had reasonable grounds to suspect Van Linn of OWI prior to the deputy's warrantless blood draw. The fact that the State subpoenaed those records only after the circuit court suppressed the deputy's unlawful blood draw does not change the independent nature of the State's suspicions that Van Linn's BAC was over the legal limit. Furthermore, the evidence discovered through the State's subpoena——the hospital's diagnostic blood test——is untainted by the deputy's unlawful conduct, thus suppressing it would not serve the exclusionary rule's purpose.

*By the Court.*—The court of appeals' decision is affirmed.

¶20 ANN WALSH BRADLEY, J. *(dissenting).* Law enforcement drew Daniel Van Linn's blood without a warrant. He refused to give consent for the blood draw, but an officer nevertheless proceeded to extract his blood.

¶21 No exception to the warrant requirement permitted such a search. After the circuit court suppressed the fruits of the State's unconstitutional foray, the State waited three months to try an end run around the Fourth Amendment and the circuit court's suppression ruling. It subpoenaed hospital records containing the information that the circuit court had earlier suppressed——Van Linn's blood alcohol content.

¶22 Providing the State with an insurance policy in the event of an unconstitutional search, the majority tells law enforcement not to worry. The majority's message is: "If you violate a person's Fourth Amendment rights and the resulting evidence is suppressed, there will be no consequences because you can still gain the information through other means."

¶23 In contrast, my message is: "Get a warrant." This entire appeal would not exist if law enforcement had simply sought a warrant in the first place.

¶24 This court should not promote a search first and warrant later approach. And it certainly should not be condoning an approach that undermines the essence of the exclusionary rule, which is to prevent——not to repair.

¶25 In giving its imprimatur to the State's tactic, the majority justifies its determination by invoking the independent source doctrine. Its rationale rests on two assertions: (1) that

1

the State did not "exploit" the illegal search because it had "reasonable grounds" to suspect Van Linn of OWI before either law enforcement or medical personnel drew his blood; and (2) that disallowing the subpoena would have no effect on police misconduct.

¶26 The first of these rationales answers the wrong question, obscuring the true inquiry of whether the unconstitutional search "prompted" the subpoena. And the second insulates law enforcement from the consequences of its unconstitutional actions. In doing so, the majority ignores that the consequence of its decision is to give a do-over to law enforcement in the event evidence gained through an unconstitutional search is suppressed.

¶27 Because the majority obscures the constitutional inquiry, erroneously concludes that suppression of the hospital sample would have no effect on police misconduct, and turns the exclusionary rule on its head by creating a perverse incentive for law enforcement to conduct warrantless searches, I respectfully dissent.

I

¶28 Van Linn was suspected of OWI and taken to a hospital. Majority op., ¶¶3-4. While at the hospital, he refused a warrantless blood draw.[1] Id., ¶5. Law enforcement directed a

_____

[1] As is his right. State v. Prado, 2021 WI 64, ¶47, 397 Wis. 2d 719, 960 N.W.2d 869 (explaining that "a person has a constitutional right to refuse a search absent a warrant or an applicable exception to the warrant requirement").

2

blood draw anyway, believing that exigent circumstances justified the warrantless search. Id.

¶29 The circuit court later determined that exigent circumstances were not present and suppressed the results of the blood draw. Id., ¶6. After this setback, and almost ten months after the arrest and three months after the State's first attempt to admit the blood evidence was rebuffed, the State pursued a different strategy. It subpoenaed the results of a separate blood test the hospital took for purposes of Van Linn's medical treatment. Id., ¶7.

¶30 In support of its application for the subpoena, the State articulated grounds for its issuance, including the results of the unconstitutionally obtained blood draw indicating that Van Linn's blood alcohol content was above the legal limit——.205. The State's second try was met with success. The subpoena for the hospital records issued and the circuit court ultimately denied Van Linn's motion to suppress the results of the hospital sample. Id., ¶8.

¶31 Van Linn appealed, and the court of appeals affirmed the circuit court's denial of this second suppression motion. State v. Van Linn, No. 2019AP1317-CR, unpublished slip op. (Wis. Ct. App. Nov. 17, 2020). The majority now affirms the court of appeals, concluding that the hospital sample is admissible under the independent source doctrine. In the majority's view, "the State did not exploit the deputy's illegal conduct because . . . the State had reasonable grounds to suspect Van Linn of OWI prior to anyone drawing his blood." Majority op., ¶17. Further, the majority concludes that "suppressing the hospital's

3

blood-test results would not further the purpose of the exclusionary rule, which is to deter police misconduct." Id., ¶18.

II

¶32 The majority rests its conclusions on its application of the independent source doctrine. This doctrine "derives from the principle that when the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." State v. Carroll, 2010 WI 8, ¶44, 322 Wis. 2d 299, 778 N.W.2d 1 (internal quotation and quoted source omitted). The "ultimate question" is whether the search conducted pursuant to the subpoena was "in fact a genuinely independent source of the information and tangible evidence at issue." Murray v. United States, 487 U.S. 533, 542 (1988).

¶33 In determining whether the independent source doctrine applies, we utilize a two-pronged analysis. First, we must determine whether, absent the illegal search, the officer would have sought the search warrant or subpoena. Carroll, 322 Wis. 2d 299, ¶45. Second, we ask if information illegally acquired influenced the magistrate's decision to authorize the warrant or subpoena. Id. (citing State v. Lange, 158 Wis. 2d 609, 626, 463 N.W.2d 390 (Ct. App. 1990)). The burden is on the State to convince the court on each of these prongs. Id. (citing Murray, 487 U.S. at 540).

¶34 Van Linn focuses his argument on the first prong of the analysis, but I pause at the preface of the discussion to briefly

4

observe that a concession by the defense to the existence of probable cause may not be tantamount to answering the question posed in the second prong.[2] Indeed, the State included in the subpoena application the results of the suppressed blood test. Why would the State include the fruits of the unconstitutional search other than in an attempt to influence the circuit court to grant the subpoena? The .205 test result in and of itself would generally be sufficient to establish probable cause. Once a circuit court sees that, "game over."

---

[2] I acknowledge the Carroll court's statement that "[a]s applied to circumstances where an application for a warrant contains both tainted and untainted evidence, the issued warrant is valid if the untainted evidence is sufficient to support a finding of probable cause to issue the warrant." State v. Carroll, 2010 WI 8, ¶44, 322 Wis. 2d 299, 778 N.W.2d 1. However, Carroll cites to Murray in support of that premise, but Murray represents a very different circumstance. Although in Murray, law enforcement had both tainted and untainted evidence sufficient to support probable cause, only the untainted evidence was presented in the application for the search warrant. See Murray v. United States, 487 U.S. 533, 535-36 (1988). Additionally, the Supreme Court voiced concern about the effect that the illegally obtained information might have on the magistrate IF it had been presented in the search warrant application. See id. at 542.

Moreover, the Carroll court's proclamation tells us nothing about the influence the tainted evidence had on a magistrate's decision to issue a subpoena. The circuit court here made no explicit factual findings that law enforcement would have applied for the subpoena absent the tainted evidence. "Murray simply does not contemplate that, in the absence of any relevant fact-finding by a trial court, an appellate court can reach its own 'inference' about whether the law enforcement officers sought the [subpoena] on the basis of evidence that is genuinely independent of the unlawfully obtained evidence." Carroll, 322 Wis. 2d 299, ¶75 (Abrahamson, C.J., dissenting).

5

¶35 The State's mention of the results of the suppressed test stands in stark contrast to the warrant application the United States Supreme Court upheld in Murray. There, "In applying for the warrant, the agents did not mention the prior entry, and did not rely on any observations made during that entry." Murray, 487 U.S. at 535-36. Thus, in addressing the question posed by the second prong——whether information illegally acquired influenced the magistrate's decision to authorize the warrant——the only tenable answer is: Who knows? The record does not reveal the answer. As a result, I think it unlikely that the State met its burden.

A

¶36 With this background in hand, I move next to address the majority opinion's errors. First, the majority rests its holding on the assertion that "the State had reasonable grounds to suspect Van Linn of OWI prior to anyone drawing his blood." Majority op., ¶17. Herein lies the majority's first error.

¶37 At the outset of its analysis, the majority correctly frames the question, focusing on "whether the State's decision to seek the subpoena was prompted by what it learned from the deputy's unlawful blood draw." Id., ¶12. Such a framing stems from the United States Supreme Court's decision in Murray, where, as indicated above, the Court wrote: "The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here." Murray, 487 U.S. at 542. Further refining the test, the Murray court explained that evidence does

6

not derive from a genuinely independent source "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." Id. (emphasis added).

¶38 But the majority's analysis quickly strays from this inquiry. It focuses not on whether any information gleaned from the illegal search prompted the subpoena application, but on whether law enforcement "exploited" the fruits of the illegal search. In answering this question, the majority highlights its conclusion that there was enough information to seek a subpoena of the hospital sample before either blood draw was conducted. See majority op., ¶17. This is not the question that Murray poses.

¶39 With our focus properly on the decision to seek a subpoena, we must ask whether the information learned from the first unconstitutional search "prompted" the second. Common sense says yes. After all, the illegal search gave the State a sneak-peek of what it was going to find in the "lawful" search: that Van Linn's blood alcohol level was above the legal limit. In other words, when law enforcement filed for the subpoena of the hospital's test results, they already knew what they were going to find due to the illegal search. Would officers really have sought the subpoena if the illegally obtained sample had shown that Van Linn's BAC was below the legal limit?

¶40 Undoubtedly, the subpoena here was also prompted by the suppression of the law enforcement sample. Without that suppression, there would have been no need to subpoena the hospital

7

sample. Accordingly, the independent source doctrine should not apply here to give the State a do-over after it collected evidence in an unconstitutional manner.

B

¶41 Second, the majority concludes that "suppressing the hospital's blood-test results would not further the purpose of the exclusionary rule, which is to deter police misconduct." Majority op., ¶18. The majority says that "[s]uppressing the hospital's diagnostic blood test . . . would have no further deterrent effect because it involved no police conduct at all, let alone misconduct." Id. Herein lies the majority's second error.

¶42 Far from having "no further deterrent effect," allowing law enforcement a second chance to "discover" the same information after it violates a person's rights in conducting a search encourages police misconduct. Instead of taking the time to apply for a warrant, why wouldn't law enforcement give a warrantless search a try if it knew that it could get the same information admitted from another source in the event the fruits of the first search are suppressed?

¶43 Justice Thurgood Marshall observed just this concern in his dissent in Murray: "Under the circumstances of these cases, the admission of the evidence 'reseized' during the second search severely undermines the deterrence function of the exclusionary rule. Indeed, admission in these cases affirmatively encourages illegal searches." Murray, 487 U.S. at 546 (Marshall, J., dissenting).

8

¶44 If the majority really wanted to discourage police misconduct, it would create a strong incentive for police to do things right the first time. Instead, it provides law enforcement with an insurance policy.

¶45 Under the majority's rule, an officer would feel free to seek evidence through unconstitutional means if the officer knew the evidence would later be available from a different source. In contrast, if the State were not given the workaround the majority sanctions in this case, an officer would be encouraged to either get a warrant for the first search or forgo the first search and subpoena the hospital record later—both options that are consistent with the Fourth Amendment's protections.

C

¶46 Finally, I am concerned about the perverse incentive created by the majority opinion vis-à-vis a law enforcement officer's initial determination whether to get a warrant.

¶47 This is an OWI case, and in the OWI context, the United States Supreme Court has determined that the dissipation of alcohol in the bloodstream does not create a per se exigency that excuses the need for a warrant. Missouri v. McNeely, 569 U.S. 141, 144 (2013). Rather, "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." Id. at 156.

¶48 Warrantless searches are generally disfavored. Indeed, they are deemed presumptively unreasonable unless an exception applies. State v. Dalton, 2018 WI 85, ¶38, 383 Wis. 2d 147, 914 N.W.2d 120.

9

¶49 Yet the majority here rewards a warrantless search. Imagine, if you will, the future officers who find themselves in an emergency room with an OWI suspect. To get a warrant or not to get a warrant?

¶50 Under the majority opinion, there is a perverse incentive to forgo a warrant application. Just take the blood sample, and if it is thrown out, simply subpoena the hospital records. No harm, no foul. But this flips the exclusionary rule on its head and turns a subpoena into "an after the fact 'insurance policy' to 'validate' an unlawful search." United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992) (citing Center Art Galleries-Hawaii, Inc. v. United States, 875 F.2d 747, 755 (9th Cir. 1989)).

¶51 The above dilemma facing an officer will recur not only in the OWI context, but also throughout modern policing. And the incentives provided by the majority will be the same, giving rise to concerning implications. Take, for example, a hypothetical raised in Van Linn's reply brief: "Consider the illegal search of a person's phone in Riley v. California, 573 U.S. 373, 379 (2014), which turned up incriminating photographs. After suppression of a search like that, could the government simply subpoena Google or Apple for those companies' copies of the same files as an 'independent source'?"

¶52 Law enforcement should not be able to circumvent a suppression decision by simply looking for the same information in another place. Instead, it should do things right the first time. The exclusionary rule "is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional

10

guaranty in the only effectively available way——by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217 (1960).

¶53 Despite the perverse incentive created by the majority opinion, the next officer to confront this situation should still just get a warrant. Indeed, the entire argument before this court would have been avoided from the get-go if law enforcement would have simply sought a warrant for the first draw of Van Linn's blood. Judicial efficiency appreciates it and the constitution demands it.

¶54 For the foregoing reasons, I respectfully dissent.